**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-4735**

───────────

UNITED STATES OF AMERICA,

                              Plaintiff - Appellee,

         v.

IZZAT FREITEKH,

                              Defendant - Appellant.

───────────

**No. 22-4736**

───────────

UNITED STATES OF AMERICA,

                              Plaintiff - Appellee,

         v.

TARIK FREITEKH, a/k/a Tareq Freitekh,

                              Defendant - Appellant.

───────────

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge. (3:20-cr-00435-FDW-DCK-1; 3:20-cr-00435-FDW-DCK-2)

───────────

Argued: May 9, 2024                                Decided: September 3, 2024

───────────

Before THACKER, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Benjamin joined.  Judge Quattlebaum wrote an opinion concurring in part, and concurring in the judgment.

———————————

**ARGUED:**  William Robinson Heroy, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE PLLC, Charlotte, North Carolina; Mark Allen Yurachek, MARK ALLEN YURACHECK & ASSOCIATES, LLC, Atlanta, Georgia; James Walter Kilbourne, Jr., ALLEN STAHL & KILBOURNE, PLLC, Asheville, North Carolina, for Appellants. Kevin James Barber, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Nicole M. Argentieri, Acting Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Jeremy R. Sanders, Assistant Chief and Appellate Counsel, Fraud Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dena J. King, United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

———————————

THACKER, Circuit Judge:

Following a jury trial, Izzat Freitekh ("Izzat") and Tarik Freitekh ("Tarik" and with Izzat, "Appellants") were convicted of various offenses arising from their roles in a fraudulent Paycheck Protection Program[1] ("PPP") loan scheme. As a result of the scheme, Appellants received $1.75 million in PPP loan funds to which they were not entitled.

Appellants lodge several arguments on appeal. Appellants primarily argue that the evidence supporting their convictions was insufficient. Tarik also avers that the district court violated his Sixth Amendment right to counsel. Izzat argues that the district court improperly limited his opportunity to cross examine Tarik's prior counsel turned witness in violation of the Sixth Amendment's Confrontation Clause as well as erred by admitting his own prior counsel's testimony as a witness for the Government. Finally, Appellants contend that the district court improperly inflated their sentencing range by applying certain sentencing enhancements pursuant to the United States Sentencing Guidelines ("Guidelines") § 2B1.1.

For the reasons stated below, Appellants fail to establish any reversible error. Therefore, we affirm.

---

[1] In 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, § 1102, 134 Stat. 285, 286 (2020). Section 1102 of the CARES Act created the Paycheck Protection Program to grant forgivable loans to small business owners for certain expenses. *Id.*

I.

A.

Izzat owned a restaurant in Charlotte, North Carolina called La Shish Kabob, as well as related businesses including La Shish Catering, Aroma Packaging Systems, and Green Apple Catering (the "Freitekh Businesses").  Izzat managed these businesses with the help of his wife, Iman, and his eight children, including his son, Tarik.

1.

*The PPP Loan Applications*

Between April 7 and May 1, 2020, Appellants submitted five PPP loan applications (the "Loan Applications") to Bank of America ("BOA") through an entity called Lendio, a "facilitator for small business loans."  J.A. 783.[2]  The Loan Applications were for each of the four Freitekh Businesses, including a duplicate for Aroma Packaging Systems.  Four of the five Loan Applications were approved in May 2020.[3]  As a result, $1.75 million was deposited into several bank accounts controlled by Izzat, including one account for which Tarik was also a signatory.  Once these funds were deposited, Izzat used the funds to, among other things, write checks to his family members in the amount of $30,000 apiece. The memorandum lines on these checks stated that they were for purposes such as "Payroll" and "Paycheck."

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] BOA terminated one application that it discovered was a duplicate loan application for Aroma Packaging Systems.

In late May 2020, BOA began investigating the Loan Applications after it discovered that La Shish Catering's application had used the employer identification number[4] ("EIN") of an unrelated company. Upon review, BOA flagged several issues and inconsistencies in connection with the Loan Applications. BOA and the Government later discovered that all of the Loan Applications were fraudulent.

The Loan Applications contained false representations and were corroborated by supporting documents that were fabricated, including fake payroll summaries and tax documents that were never filed with the Internal Revenue Service ("IRS"). For instance, the Green Apple Catering application sought a $1 million loan based on certifications that the company was in operation as early as February 15, 2020[5] and had 25 employees. In reality, Green Apple Catering did not exist until March 2020, and it had no employees. The other Loan Applications similarly inflated the companies' employee numbers and payrolls, and they included falsified tax and payroll documents.

2.

*The July 2020 Meeting with the Government*

Izzat requested a proffer meeting with the Government that took place on July 27, 2020 (the "July 2020 Meeting"). Izzat disclaimed any involvement in preparing or submitting the Loan Applications. Indeed, during the July 2020 Meeting, Izzat stated that

---

[4] A business's EIN is a unique nine-digit identifier assigned by the Internal Revenue Service to businesses for tax purposes.

[5] To qualify for a PPP loan, an entity must have been "in operation on February 15, 2020" according to Section 1102 of the CARES Act.

neither he nor his wife contacted BOA in connection to the Loan Applications. Instead, Izzat accused a third party, Kyber Capital ("Kyber"), of initiating and filing the false Loan Applications. Izzat claimed that Kyber had contacted him by phone in March 2020, offering assistance in applying for PPP loans. He claimed that Kyber proposed to handle the submission of the PPP loan applications, with the condition that it receive 3% of the loan amount as a fee.

According to Izzat, Kyber also requested that he pay an up front fee of $1,000 in order to initiate the loan application process. Izzat alleged that he paid this fee by electronically transferring $1,000 to an entity called "Seven Digital FZE" at Kyber's request. Additionally, Izzat stated that Kyber required him to execute power of attorney documents, which he alleged he did on April 1, 2020. Following the July 2020 Meeting, Izzat's attorney, Preston Odom ("Odom") sent the Government a package containing envelopes that Kyber had ostensibly used to mail the power of attorney documents to Izzat as well as additional information with respect to the Seven Digital bank account.

Under scrutiny, Appellants' story fell apart. First, the envelopes Kyber allegedly used to mail Izzat the power of attorney documents listed a return address and phone number for Kyber that did not correspond to any known company named Kyber or any entity associated with PPP loans. Because the envelopes were purchased with cash, the Government was unable to trace them back to any individual purchaser. But, notably, the envelopes were mailed from a post office less than a mile from Tarik's California residence. Moreover, the envelopes did not align with the timeline provided by Izzat. The

envelopes were postmarked *more than a month after* Izzat claimed he received the power of attorney forms from Kyber.

Second, the Government was able to trace the IP addresses that generated the online submissions in support of the Loan Applications. The IP addresses traced back to Appellants. Moreover, within Lendio's system, which Appellants used to facilitate their application process, "all of the key events associated with setting up the account [for the Loan Applications], submitting the applications, certifying the application[s], and uploading supporting documents" all occurred from an IP address, ending in -192, which traced back to Tarik's California residence. J.A. 1834. A second IP address, ending in -252, was also associated with the Lendio account. The -252 IP address belonged to La Shish Kabob. The first logged event from that IP address occurred in Charlotte, North Carolina on May 23rd, 2020. Through a subpoena for the contents of Tarik's iCloud account, the Government was able to deduce that Tarik traveled to Charlotte "the day before that first logged event" from La Shish Kabob's IP Address. *Id.* at 1335.

And often, the activity on Tarik's IP address occurred close in time after Izzat forwarded emails he received from BOA to Tarik. For example, on April 16, 2020, Izzat received an email from BOA with the subject line, "We have not received all of your loan application documents," asking for additional documentation in support of the Loan Applications. J.A. 1316. That same day, Izzat forwarded the email to Tarik. That evening, someone using Tarik's IP address logged in and uploaded the additional documents requested by BOA to support the Loan Applications. Additionally, despite Izzat's claims that neither he nor his wife ever contacted BOA about the Loan Applications, the

Government recovered multiple emails from Iman's email address to BOA officials. In those emails, someone using Iman's email address provided BOA with updated information to support the Loan Applications and requested estimated timelines from BOA on the processing time for the Loan Applications.

The circumstances surrounding the $1,000 initial payment to Kyber raised similar credibility issues. First, the Seven Digital email account that confirmed receipt of the $1,000 payment was linked to SMM Lite, a company run by an associate of Tarik's. Beyond that, the Seven Digital bank account, which was supposed to have received the $1,000 initial payment to Kyber, did not exist.

Finally, Izzat falsely indicated on the checks to his family members that they were payroll payments. At trial, Izzat admitted that he used some of the funds received to give "each child $30,000," because, "he owed them money and they worked with him all his life." J.A. 1087–88. But none of the recipients were listed on the relevant companies' payroll records. Despite this, the memo lines on the checks read "Payroll" or "Paycheck." Presumably, Izzat made these notations on the checks in order to give the impression that he was adhering to the CARES Act's permitted uses of PPP loan funds.[6]

Ultimately, BOA froze the accounts into which the PPP loan money was deposited, and the Government was able to seize $1.3 million of the $1.75 million in PPP funds that

---

[6] Section 1102 of the CARES Act limited "allowable uses" of PPP loans to business expenses such as "payroll costs," "employee salaries, commissions, or similar compensations," "rent," and "utilities." Pub. L. 116-136, § 1102, 134 Stat. 285, 290 (2020) (codified as amended at 15 U.S.C. § 636(a)(36)(F) (2022)).

Appellants had received from the frozen accounts.  Eventually, that money was returned to BOA as the lender of the PPP loans.

## B.

### 1.

In December 2020, Appellants were indicted for bank fraud and conspiracy to commit wire fraud ("Original Indictment").  Additionally, the Original Indictment included a charge against Izzat for false statements allegedly made during the July 2020 Meeting with the Government.  The false statement charge relied on statements Izzat made regarding the existence of Kyber, including the alleged envelopes Izzat provided to the Government through his counsel, which the Government alleged were falsified.  The false statements charge also arose out of Izzat's claims that neither he nor his wife ever contacted BOA about the Loan Applications, when, in fact, someone using Iman's email address contacted BOA.  Because Odom, who had represented Izzat during the July 2020 Meeting, was to be a necessary witness for the Government, Izzat opted for new counsel.

During the discovery process, Tarik's attorney, Christopher Fialko ("Fialko") provided the Government with computer screenshots of a chat conversation between Tarik and an alleged representative of Kyber.  This conversation allegedly took place on Seven Digital's website, smmlite.com.  The screenshots purported to show Tarik providing various information and login credentials to the Kyber representative for the purpose of obtaining the PPP loans.  Toward the end of the purported chat, the Kyber representative expressed dissatisfaction, stating "Why you don't send me my 3 percent? You keep ignoring. It's not good. I only was paid $1,000." J.A. 1371.

Like the Kyber envelopes, these screenshots were inconsistent with Appellants' account of the events involving Kyber. Tarik's chat conversation with the alleged Kyber representative was time-stamped a *week before* the $1,000 payment was even made. And the chat messages, like the Seven Digital bank account, were also associated with SMM Lite -- the company run by Tarik's associate.

On August 17, 2021, a multi-count superseding indictment ("Superseding Indictment") -- the operative indictment here -- was returned against Appellants. In addition to the counts in the Original Indictment, which were conspiracy to commit wire fraud (Count One against both Appellants); bank fraud (Count Two against both Appellants); and making false statements (now Count Eight against Izzat), the Superseding Indictment added the following charges:

- Count Three -- conspiracy to commit money laundering (both Appellants);

- Count Four -- money laundering in the amount of $149,000 for an online banking transfer (both Appellants);

- Count Five -- money laundering in the amount of $30,000 for a check written in the amount of $30,000 (Izzat);

- Count Six -- money laundering in the amount of $30,000 for a check written in the amount of $30,000 (both Appellants);

- Count Seven -- money laundering in the amount of $30,000 for a check written in the amount of $30,000 (Izzat); and,

- Count Nine -- falsifying and concealing material facts (Tarik).

Count Nine of the Superseding Indictment charged Tarik with submitting false evidence to the Government by "produc[ing] computer screenshots to the [G]overnment purporting to

show Tarik . . . providing information to an unknown individual [allegedly from Kyber] and that the unknown individual submitted the loan applications."  J.A. 47.

2.

To prosecute the false statements charges (Counts Eight and Nine) against Izzat and Tarik, the Government requested that Appellants stipulate to the admissibility of the underlying documentation -- that is, the envelopes, the bank account documents, and the chat screenshots.  When Appellants refused to stipulate, the Government filed a "Motion for Inquiry into Status of Counsel" since Fialko became a necessary witness for the Government because he would be required to testify regarding the provenance of the screenshots.  Fialko agreed that his role as both counsel and witness would be improper and moved to withdraw as Tarik's counsel.  The district court granted the motion and delayed trial for six months to allow new counsel adequate time to prepare a defense.

When the Government issued subpoenas to Fialko and Odom for trial testimony, Appellants moved to quash the subpoenas primarily on the basis that the attorneys' testimony would breach attorney-client privilege.  While Fialko and Odom joined in each of Appellants' motions, they also filed their own motions objecting to the Government's subpoenas.  Tarik's motion alternatively suggested modifying the subpoena to limit the Government's examination and restrict the Government's questioning to only the attorneys' involvement and actions regarding the purportedly false evidence.  The district court agreed with this alternative approach and limited the trial subpoenas to Fialko and Odom to the following inquiries:

1.    Did you previously represent [Appellant] in this case?

11

2.  During that representation, did you receive [the documents at issue] that you provided to the Government on [date]?

3.  What is the name of the person who gave you the [documents at issue]?

4.  Were these documents provided to the Government for [reciprocal discovery/in connection with an interview]?

5.  Did you alter the [documents at issue] in any way before providing them to the Government?

J.A. 360–61.

During the trial, Odom and Fialko, as the former attorneys of Appellants, provided limited testimony according to the court mandated questions. The district court instructed the jury that neither Fialko nor Odom was testifying "on their own volition," but instead was appearing because the court "ha[d] issued a subpoena forcing them to [testify]." J.A. 1143. Then, the district court excused the jury from the courtroom in order to conduct a preview of the cross examination of prior counsel so as to assure that no issues of attorney-client privilege would arise. Thereafter, the jury returned for the actual cross examination.

During his testimony, Odom stated that he received the Kyber envelopes and the Seven Digital bank account information from Izzat. Fialko testified that he received the screenshots depicting Tarik's chats with the alleged Kyber representative via email from someone named Rashan Verm. Fialko recalled that he made "a couple of attempts" to reach out to Verm after receiving the email, but Fialko never received a response, nor was he able to garner additional information as to Verm's identity. J.A. 1254.

3.

Izzat testified in his own defense at trial. He admitted that the Loan Applications for his businesses were falsified but placed the blame on Kyber as the alleged preparer of the Loan Applications. Izzat claimed he only realized something was amiss when he received the $1 million loan for Green Apple Catering on May 14, 2020. This was due to Green Apple's lack of employees and its formation occurring after the requisite date for an entity to qualify for a PPP loan -- February 15, 2020. Izzat again denied having written "Payroll" in the memo line on any of the checks to his family members. Izzat said that he did not speak enough English and therefore "relied on English-speaking family members to write words on checks after he filled in the numbers." Izzat's Opening Br. at 17. Izzat also testified that one of the "Payroll" checks was made out to his son-in-law for replacing La Shish Kabob's air conditioning system. Tarik chose to invoke his Fifth Amendment right to remain silent and opted not to testify at trial.

The jury found Izzat guilty of the following:

- Count Three (conspiracy to commit money laundering);
- Count Five (money laundering);
- Count Six (money laundering);
- Count Seven (money laundering); and,
- Count Eight (false statements).

Izzat was acquitted of the following charges:

- Count One (conspiracy to commit wire fraud);
- Count Two (bank fraud); and,
- Count Four (money laundering).

13

As to Tarik, the jury found him guilty of the following:

- Count One (conspiracy to commit wire fraud);
- Count Two (bank fraud);
- Count Three (conspiracy to commit money laundering);
- Count Four (money laundering); and,
- Count Nine (falsifying and concealing material facts).

The jury acquitted Tarik of Count Six (money laundering). The district court denied Appellants' separate motions for a judgment of acquittal and a new trial.

4.

According to Izzat's Presentence Investigation Report ("PSR"), his money laundering convictions subjected him to Guidelines § 2S1.1, which sets the base offense level by reference to the Guideline section "for the underlying offense from which the laundered funds were derived." Guidelines § 2S1.1(a)(1). The underlying offense here was the bank fraud that resulted in the improper deposit of the PPP loan money. The sentencing range for fraud is determined by reference to Guidelines § 2B1.1 which calculates the amount of loss derived from the fraudulent scheme. The PSR noted that despite Izzat being acquitted of the bank fraud and conspiracy to commit wire fraud charges, Guidelines § 1B1.3 nonetheless holds Izzat accountable for the conduct related to the PPP loan scheme because the evidence presented at trial proved that Izzat participated in the illicit conduct underlying both counts. Thus, the PSR recommended a base offense level of six for Izzat.

Because Appellants' fraud sought $1.75 million in loans to which they were not entitled, the PSR recommended a 16 level increase to Izzat's base offense level. This is because Guidelines § 2B1.1 recommends a 16 level increase if "the amount of loss [was]

14

more than $1,500,000 but [did] not exceed $3,500,000." J.A. 2655 (citation omitted).

Izzat's PSR also recommended the following enhancements:

- +2 levels because Izzat had "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," *id.*, pursuant to Guidelines § 2B1.1(b)(17)(A);

- +2 levels for obstruction of justice pursuant to Guidelines § 3C1.1;

- +2 levels for use of sophisticated means pursuant to Guidelines § 2B1.1(b)(1)(l); and,

- +1 level pursuant to Guidelines § 2S1.1(b)(2)(A) because Izzat was convicted of a crime in violation of 18 U.S.C. § 1957.[7]

In sum, the PSR recommended a total offense level of 29, which, in light of Izzat's criminal history category of I, resulted in a recommended Guidelines sentencing range of 87 to 108 months of imprisonment.

Tarik's PSR followed a similar format. Based on his fraud convictions, Tarik's PSR assigned a base offense level of six pursuant to Guidelines § 2B1.1. Tarik's PSR recommended the following enhancements:

- +16 levels because the amount of loss was more than $1,500,000 but less than $3,500,000 pursuant to Guidelines § 2B1.1(b)(1)(I);

- +2 levels for use of sophisticated means pursuant to Guidelines § 2B1.1(b)(1)(l);

- +2 levels for obstruction of justice pursuant to Guidelines § 3C1.1; and,

---

[7] Izzat's convictions pursuant to 18 U.S.C. § 1957 include Counts Five through Seven, the substantive money laundering counts.

- +1 level pursuant to Guidelines § 2S1.1(b)(2)(A) because Tarik was convicted of a crime in violation of 18 U.S.C. § 1957.[8]

This resulted in a total offense level of 27, which based on Tarik's criminal history category of I, amounted to a Guidelines sentencing range of 70 to 87 months of imprisonment.

5.

At his sentencing hearing, Izzat made multiple objections to enhancements recommended in his PSR. Izzat objected to the loss amount calculation as well as to the gross receipts enhancement. Regarding the loss attributed to Izzat, he maintained that the evidence was insufficient to tie him to the fraudulent Loan Applications, such that Izzat caused $0 in actual or intended loss and was undeserving of any loss enhancement. As to the gross receipts enhancement, Izzat argued that it was improperly applied because Izzat was acquitted on all of the substantive fraud counts. In other words, Izzat argued that he never received gross receipts as a result of the crimes for which he was convicted, which included only conspiracy to commit wire fraud, money laundering, and false statements.

In ruling on Izzat's objections, the district court noted, "We do look at all of the evidence, even relevant conduct." J.A. 2258. And in looking to Izzat's relevant conduct, the district court held that "the evidence presented at trial proved that [Izzat] participated in the conspiracy to commit wire fraud and [the] bank fraud [scheme], and that these offenses resulted in the funds laundered into a money laundering conspiracy, even if [Izzat]

---

[8] Tarik's conviction pursuant to 18 U.S.C. § 1957 arises from Count Four, a substantive money laundering count.

wasn't found guilty beyond a reasonable doubt for [the substantive charges]." *Id.* Thus, the district court overruled both of Izzat's sentencing objections.

At his sentencing, Tarik also lodged several objections to the enhancements listed in his PSR. Tarik objected to the amount of "loss" calculated for his offenses. Tarik objected to the use of the full PPP Loan Application amount of $1.75 million to calculate his Guidelines sentencing range. In his view, only the laundered amount of money -- $149,000 -- should have been used to calculate the base offense level for his money laundering conviction (Count Four). The $149,000 amount is derived from the bank transfer amount giving rise to Count Four of the Superseding Indictment. Further, Tarik argued that because the Government recovered approximately $1.3 million of the $1.75 million PPP loan money, the actual loss amount of $449,691, or the money the Government did not recover, should have been used to calculate his base offense level for his fraud convictions (Counts One and Two). The district court instead used the "intended loss," which equated to the full $1.75 million.

Tarik also objected to the sentencing enhancement for use of sophisticated means. He argued that sophistication requires more than the common concealment or complexities inherent in fraud. He argued that the PPP loan scheme necessarily required the fabrication of documents and the establishment of a shell corporation, and, therefore, it did not meet the threshold for utilizing sophisticated means. The district court overruled each of Tarik's objections.

The district court sentenced Izzat to a term of 48 months of imprisonment and Tarik to 87 months of imprisonment, each to be followed by three years of supervised release.

This timely appeal followed.

II.

On appeal, Izzat challenges the sufficiency of the evidence to support his convictions for conspiracy to commit money laundering (Count Three)[9] and making false statements to the Government (Count Eight); the district court's limitation on his cross examination of Tarik's former attorney, Fialko; the court's admission of the testimony of Izzat's own former attorney, Odom; and the court's calculation of his Guidelines sentencing range.

For his part, Tarik contests the sufficiency of the evidence to support his falsified evidence conviction (Count 9);[10] the district court's grant of Fialko's motion to withdraw as Tarik's counsel; the district court's calculation of his Guidelines sentencing range; and the reasonableness of his sentence pursuant to 18 U.S.C. § 3553(a).

We approach these issues by first addressing the sufficiency of the evidence, then turning to the contentions regarding Appellants' former attorneys, and finally turning to the issues at sentencing.

---

[9] Izzat does not challenge his convictions for money laundering (Counts Five through Seven).

[10] Tarik does not challenge the sufficiency of the evidence against him on the remaining counts of conviction.

A.

Whether Sufficient Evidence Supports Appellants' Convictions

1.

Once a jury returns a guilty verdict, "the court may set aside the verdict and enter an acquittal" if the court concludes that the evidence presented at trial is insufficient to sustain a conviction. Fed. R. Crim. P. 29(c)(2). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation marks omitted). Thus, a defendant who challenges the sufficiency of the evidence "bears a heavy burden." *Id.* (internal quotation marks omitted).

On appeal, we review a denial of a motion for acquittal de novo. *United States v. Smith*, 21 F.4th 122, 139 (4th Cir. 2021). "If there is substantial evidence to support the verdict, after viewing all of the evidence and the inferences therefrom in the light most favorable to the Government, then we must affirm." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994); *see also Musacchio v. United States*, 577 U.S. 237, 243 (2016) ("The reviewing court considers only the legal question whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotation marks omitted)). "Furthermore, this court cannot make its own credibility determinations but must assume that the jury resolved all contradictions in testimony in favor of the Government." *United States v. Penniegraft*, 641 F.3d 566, 572 (4th Cir. 2011) (cleaned up).

19

2.

Appellants argue that the district court erred in denying their motions for judgment of acquittal by concluding that substantial evidence supported Appellants' convictions. Izzat contends that the evidence fails to support a conviction against him for Count Three (conspiracy to commit money laundering) and Count Eight (false statements). Tarik argues that the evidence was insufficient to convict him on Count Nine (falsifying and concealing material evidence).

For the reasons stated below, we affirm the district court's denial of Appellants' motions for judgment of acquittal.

a.

*Sufficiency of the evidence to support Count Three*

Izzat argues that the evidence at trial was insufficient to support a conviction on Count Three -- conspiracy to commit money laundering. Count Three alleges Izzat's knowledge of, or at least willful blindness to, the illicit nature of the Loan Applications. A conviction for the crime grounding the conspiracy, substantive money laundering pursuant to 18 U.S.C. § 1957, requires proof that "the defendant knowingly participated in a monetary transaction involving criminally derived proceeds." *United States v. Cherry*, 330 F.3d 658, 668 (4th Cir. 2003) (internal quotation marks omitted). A money laundering conspiracy pursuant to 18 U.S.C. § 1956(h) "require[s] nothing more than an agreement to launder money." *United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021). The Government "may prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the

20

circumstances" surrounding the conspiracy. *United States v. Vinson*, 852 F.3d 333, 358 (4th Cir. 2017) (internal quotation marks omitted).

Izzat argues that the district court failed to consider the lack of direct evidence supporting any knowledge on his part of a money laundering scheme. For instance, Izzat emphasizes that no forensic evidence inculpating Izzat ever arose, "such as communications directing others to forge documents." Izzat's Opening Br. at 21. Izzat also argues that even if he "wrote" the checks improperly distributing the PPP loan money to his family, it would have only been the dollar amounts, the date, and his signature -- "not the English words" such as "Payroll." *Id.* at 10, 22. Instead, Izzat shifts the blame to his daughter, who had "special access" to Izzat's business dealings and "helped . . . with check writing." *Id.* at 22.

We conclude that the circumstantial evidence cited by the Government is sufficient to uphold Izzat's conviction on Count Three. As proof of Izzat's conspiracy to launder money, the Government submitted multiple emails in which Izzat forwarded Tarik the requests from BOA for more information or documentation in support of the Loan Applications. It was following these emails that Tarik allegedly uploaded falsified documentation in support of the Loan Applications. This provided the jury a basis from which to infer that Izzat conspired to engage in monetary transactions involving criminally derived proceeds by, for example, writing checks to his family members with funds from the fraudulently obtained PPP loans. Regarding the checks made out to his family, Izzat admitted at trial that he "paid [his] family" because they had worked to help him and he "thought to help them as they help[ed] [him]." J.A. 1672–73. Even if Izzat denied writing

"Payroll" on the checks to his family as part of the scheme, it is the role of the jury to weigh credibility. *See Penniegraft*, 641 F.3d at 572.

Despite Izzat's contentions to the contrary, the Government was not required to present direct evidence of his knowledge of the illicit nature of the funds -- evidence of willful blindness was sufficient for the jury to convict. As the Supreme Court has stated, "[b]ecause the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction." *Whitfield v. United States*, 543 U.S. 209, 214 (2005). It is enough to support the conspiracy conviction if substantial evidence supports that Izzat "deliberately turned a blind eye to any illegal . . . activity" regarding the Loan Applications and illicitly obtained funds. *Vinson*, 852 F.3d at 357 (citation omitted).

Considering the emails between Izzat and Tarik, as well as the checks written by Izzat to his family improperly distributing the PPP loan money, we hold that the evidence presented at trial was sufficient to prove conspiracy to commit money laundering, and thus sufficient to uphold Izzat's conviction on Count 3.

b.

*Sufficiency of the evidence to support Count Eight*

Count Eight charged Izzat with knowingly making materially false statements in violation of 18 U.S.C. § 1001(a)(2) during the July 2020 Meeting with the Government. To prove a violation of § 1001(a)(2), the Government must establish that (1) "the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false"; (2) "the defendant acted knowingly or willfully"; and

(3) "the false statement or concealed fact was material to a matter within the jurisdiction of the agency." *United States v. Ismail*, 97 F.3d 50, 60 (4th Cir. 1996) (internal quotation marks omitted).

In support of Izzat's conviction on Count Eight, the Government relies on allegedly false statements made by Izzat during the July 2020 Meeting. Specifically, through counsel, Izzat provided the Government with the purported Kyber power of attorney documents, the envelopes associated with those documents, and information, including screenshots, of the Seven Digital bank account to which Izzat transferred the alleged $1,000 payment to Kyber. The Government alleged these documents were falsified. Count Eight also relies on statements made by Izzat during that same meeting that neither he nor his wife, Iman, emailed BOA officials regarding the status of the PPP loans. The Government likewise alleged these statements were false.

Substantial evidence supports Izzat's conviction as to Count Eight. During the July 2020 Meeting with the Government, Izzat claimed that Kyber collected his information and business records and submitted the Loan Applications on his behalf in exchange for a payment of $1,000 and a return of 3% of the loan amount. During trial, Izzat confessed to having concerns about the PPP loans and acknowledged that he sensed "something was wrong." J.A. 1647. And Izzat further testified that he realized that something was not right when he received the $1 million loan for Green Apple Catering in May 2020, which "way exceeded his needs." *Id.* at 1648. Notably, Green Apple Catering had no employees and had only been operational for two months prior to Appellants obtaining the loan. Yet,

despite these suspicions arising *months before* the July 2020 Meeting with the Government, Izzat still placed full blame for the PPP loan scheme on Kyber.

And, at trial, the Government presented evidence that a rudimentary search into Kyber's purported contact information should have revealed to Izzat that the company was fake. For instance, the purported mailing address and telephone number for Kyber belonged to real companies with no relation to a "Kyber" or any PPP loan company. A jury, considering this evidence in the Government's favor, could reasonably doubt Izzat's claim that he believed Kyber was a legitimate company. And the envelopes Izzat alleged to have received from Kyber did not match the timeline Izzat provided to the Government. Izzat claimed that, on April 1, 2020, he signed the power of attorney agreements he received from Kyber. But the envelopes which allegedly contained the power of attorney documents from Kyber were actually dated *a month later*, May 11, 2020, and were mailed to Izzat from a post office located less than one mile from Tarik's residence in California. Weighing these facts favorably for the Government, a rational fact finder could readily conclude that Izzat assisted in creating the purported Kyber story by, among other things, falsifying the envelopes Izzat allegedly received from Kyber in order to conceal the illicit PPP loan scheme.

As to Izzat's knowledge of Iman's emails, the Government presented evidence at trial that Iman sent two emails to BOA, asking for updates on the Loan Applications. Izzat was copied on these emails. Therefore, a rational trier of fact could conclude that Izzat made false statements at the July 2020 Meeting with the Government when he swore to the

Government that neither he nor Iman had reached out to BOA regarding the status of the Loan Applications.

c.

*Sufficiency of the evidence to support Count Nine*

Tarik argues that the evidence presented at trial was insufficient to convict him on Count Nine -- falsifying and concealing material facts in violation of 18 U.S.C. § 1001(a)(2).  Count Nine relies on Tarik's production of "computer screenshots to the [G]overnment purporting to show Tarik . . . providing information to an unknown individual and that the unknown individual submitted the loan applications."  J.A. 47.  A violation of 18 U.S.C. § 1001(a)(2) for falsifying and concealing material facts relies on the same elements described above for Count Eight.  *See Ismail*, 97 F.3d at 60.

Tarik first argues that the chat log was not material to the Government's investigation as the "decision to charge [him] on the other alleged offenses[] had been reached long prior" to the submission of the chat log to the Government.  Tarik's Opening Br. at 29.  And second, Tarik argues that the evidence as to Count Nine is insufficient because the Government did not prove that he submitted the chat log in question to his attorney.  Instead, Tarik relies on the fact that Fialko received the chat log in an email from a third party, Verm.  These arguments lack merit.

First, Tarik's argument that the chat log was immaterial to the Government's investigation is nonsensical.  A "materially false statement is one that has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed."  *United States v. Barringer*, 25 F.4th 239, 251 (4th Cir. 2022) (internal

25

quotation marks omitted). It is irrelevant "whether the false statement *actually influenced* the agency's decision-making process." *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012) (emphasis added).

Tarik argues that the chat log could not have affected the Government's decision to charge him because "the proffered discovery response occurred at a juncture when it could not possibly have altered the Government's decision to charge the Defendant" because Tarik had already been charged. Tarik's Opening Br. at 30. But § 1001(a) is not limited to only the Government's decision to charge Tarik. *See United States v. Smith*, 54 F.4th 755, 769 (4th Cir. 2022), cert. denied 143 S. Ct. 1097 (2023) (holding that false statements made during the investigation were capable of influencing the "still-active investigation"). Tarik, through Fialko, submitted the chat log to the Government in March 2021. At that time, Appellants were charged only with the Original Indictment. Had the chat log been genuine, it would have served as exculpatory evidence in Tarik's defense. Exculpatory evidence supporting the Kyber story could have influenced the Government's trial preparation, including decisions as to how to prosecute the case as well as any potential plea negotiations. *See id.* ("These misrepresentations, under normal circumstances, could cause [the Government] to re-direct their investigation to another suspect, question their informant differently or more fully, or perhaps close the investigation altogether." (internal quotation marks omitted)). Thus, the fabricated chat log was material because it had the "natural tendency to influence" the Government's decisions in trial preparation. *Barringer*, 25 F.4th at 251 (internal quotation marks omitted).

26

Next, viewing the record in a light most favorable to the Government, we conclude that sufficient evidence supported that Tarik knew the chat log was false and that it would be submitted to the Government. The jury was presented with sufficient evidence to support that the chat log was created on a website associated with a company owned by an associate of Tarik -- SMM Lite. SMM Lite is the same company associated with the bank account to which Izzat paid $1,000 purportedly to Kyber. Given this evidence, despite the email to Fialko containing the falsified chat log coming from Verm, a third party, a reasonable fact finder could conclude that Tarik fabricated the chat log and had it submitted to Fialko so that it would be used to support his defense at trial.

Thus, the evidence was sufficient for the jury to convict Tarik of Count Nine, falsifying and concealing material facts.

## B.
### Sixth Amendment and Evidentiary Issues at Trial

On appeal, Appellants raise three issues related to the testimony of their former counsel at trial. Tarik argues that the district court violated his Sixth Amendment right to counsel of his choice when it granted Fialko's motion to withdraw as counsel over Tarik's objection. And Izzat contends that the district court violated his Sixth Amendment right to confront Fialko by limiting his cross examination of Fialko. Finally, regarding his own prior counsel, Izzat argues that the district court erred by admitting Odom's testimony which he asserts was unduly prejudicial and unnecessary to the Government's case.

1.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). However, this right is not without limits. "The right is circumscribed by, among other things, the obligation of trial courts to safeguard the integrity of the proceedings before them." *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997). "Trial judges may on occasion be required to decline a defendant's offer to waive his own attorney's conflict of interest and indeed district courts 'must be allowed substantial latitude' in rejecting waivers of this sort." *Id.* (quoting *Wheat v. United States*, 486 U.S. 153, 163 (1988)). We have insisted that a trial court "must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal" if it disqualifies a defendant's chosen lawyer. *United States v. Williams*, 81 F.3d 1321, 1324 (4th Cir. 1996).

Prior to trial, the district court granted Fialko's motion to withdraw as counsel based on the Government's intention to call him as a necessary witness to Tarik's false statement charge. When the Government subpoenaed Fialko and Odom to testify, Appellants, as well as prior counsel, filed separate motions to quash the subpoenas. The district court denied the motions but cabined the Government's direct examination to the five inquiries regarding counsels' prior representation of Appellants. We review the district court's rulings regarding Fialko's motion to withdraw and Appellants' motion to quash for abuse

of discretion. *United States v. Calwell*, 7 F.4th 191, 202 (4th Cir. 2021) (review of motion to disqualify counsel).

The Sixth Amendment also guarantees a defendant the right "to be confronted with the witnesses against him" in all criminal prosecutions. U.S. Const. amend. VI. The right of confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Indeed, the Supreme Court has stated, "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* at 315–16 (internal quotation marks omitted).

"It does not follow, however, that the Confrontation Clause of the Sixth Amendment prevents a trial court from imposing any limits on the scope of defense counsel's cross-examination and presentation of evidence related to the impeachment of a key prosecution witness's credibility." *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir. 2000). "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

We review de novo any alleged violation of the Confrontation Clause. *United States v. Mouzone*, 687 F.3d 207, 213 (4th Cir. 2012). On appeal, violations of the Confrontation Clause are subject to harmless error review. *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007) (internal quotation marks omitted)).

2.

a.

*Tarik's Sixth Amendment right to counsel of his choice*

Tarik argues that the district court violated his Sixth Amendment right to counsel of his choice when it granted Fialko's motion to withdraw. Specifically, Tarik contends that "[t]he Government caused Mr. Fialko's disqualification by issuing a subpoena for his testimony." Tarik's Opening Br. at 20. Tarik believes that Fialko's testimony was unwarranted and unnecessary because the Government had other "independent proof that [Appellants] had not relied on third parties who were the source of the fraud." *Id.* at 24.

We hold that granting Fialko's motion to withdraw was well within the district court's broad discretion. Fialko was the only available witness who could lay the foundation of the documents in support of Tarik's falsifying and concealing material evidence charge. Thus, the need for Fialko to testify at trial created a conflict of interest where Fialko would no longer be in the position to challenge the submission of the chat log to the Government. Indeed, North Carolina Rule of Professional Conduct 3.7 prohibits a lawyer from "act[ing] as advocate at a trial in which the lawyer is likely to be a necessary witness." N.C. R. Prof. Conduct 3.7(a).

And disqualifying Fialko was proper where "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *United States v. Urutyan*, 564 F.3d 679, 686 (4th Cir. 2009) (internal quotation marks omitted). Tarik was free to hire a lawyer to defend him who was not also an essential

witness in the Government's case.  Thus, the district court properly disqualified Fialko, particularly given that Tarik refused to stipulate to the foundation of the evidence in order to remedy the situation.

b.

*Izzat's Sixth Amendment right to confront witnesses against him*

Izzat argues that the district court violated his Sixth Amendment right to confront witnesses against him when the district court limited Izzat's cross examination of Fialko due to attorney-client privilege concerns.  Izzat wanted to cross examine Fialko because Fialko had received an email from a purported third party, Verm, containing conversations allegedly supporting the existence of Kyber.  Izzat hoped to call into question the provenance of that email in order to establish Tarik's relationship with a potential co-conspirator -- Verm -- or further establish Tarik as the true mastermind behind the Kyber cover story.

At trial, the district court and the parties agreed that Fialko and Odom would first answer the court approved questions on direct examination by the Government.  Then, the jury would be excused from the courtroom for cross examination, in case any privilege issues arose.  Once any issues were decided by the court and preliminary cross examination was complete, the jury would return for the actual cross examination.

During Izzat's cross examination of Fialko outside of the presence of the jury, Izzat attempted to question Fialko about the third party email from Verm sending the falsified chat log to Fialko.  Specifically, Izzat asked Fialko whether he recalled any other information in the email besides the attached screenshots.  When Fialko responded that he

31

would have to discuss communications between Tarik and himself in order to answer Izzat's question, Tarik objected on the basis that the response could reveal information subject to the attorney-client privilege. This objection prompted the court to continue the questioning ex parte outside of the presence of the Government. The district court allowed Izzat to further question Fialko for the record, though it sustained Tarik's objection that the content of the email from Verm was protected by attorney-client privilege.

Izzat argues that the district court violated his right to confront Fialko when it limited Izzat's line of questioning about the contents of the third party email from Verm to Fialko. Izzat argues that the district court prevented him "from establishing through Fialko that Izzat did not direct someone else to send the screenshots" and from eliciting information about Tarik's relationship with the third party who sent the email, who Izzat argues could have been Tarik's co-conspirator, not Izzat. *See* Izzat's Opening Br. at 28–29. In response, the Government contends that no error occurred because the district court's restriction of Izzat's questioning of Fialko was modest, requiring only that Izzat's questioning refrain from those "questions that are directly communications between client and counsel." J.A. 1255.

Because Fialko's testimony was "only marginally relevant" to Izzat, we hold that the district court did not err by limiting the cross examination of Fialko. *Van Arsdall*, 475 U.S. at 679. The Government called Fialko to lay the foundation of the allegedly falsified chat log. At no point did the Government contend that Izzat played any part in falsifying those documents or submitting them to the Government. Therefore, Fialko's testimony was not related to Izzat's charges.

And even so, Izzat was able to cross examine Fialko regarding any accusation that Izzat played a role in falsifying the chat log. For instance, Izzat's counsel asked Fialko on cross examination, "Did you have any indication that that email was sent from Izzat Freitekh? . . . And you're not aware of any involvement on Izzat's part of sending that email to you, are you?" J.A. 1170. Fialko answered both questions in the negative.

In any event, even if Izzat could point to an abuse of discretion by the trial court in limiting his cross examination of Fialko, any such error would be harmless. *United States v. Draven*, 77 F.4th 307, 319 (4th Cir. 2023) ("[A]n error is harmless if it did not have a substantial and injurious effect of influence in determining the jury's verdict." (internal quotation marks omitted)). Fialko's testimony had little to no effect on Izzat's verdict. Rather, Fialko's testimony only served "to prove that Tarik [was the one who] gave the screenshots to the [G]overnment through Fialko, and the [G]overnment never claimed or even suggested Izzat was involved" in that event. United States Resp. Br. at 38. Therefore, because Izzat's convictions did not rely on Fialko's testimony, the limitation on Izzat's cross examination of Fialko, especially in light of attorney-client privilege concerns, was harmless.

c.

*The relevance of Odom's testimony against Izzat*

Over Izzat's objection, the district court admitted the testimony of Izzat's prior counsel, Odom, who represented Izzat at the July 2020 Meeting with the Government. Odom's testimony related to the Kyber envelopes and Seven Digital banking information, and, specifically, how Odom received those documents from Izzat and turned them over to

33

the Government at Izzat's request. On appeal, Izzat argues that the testimony was irrelevant and unduly prejudicial in violation of Federal Rules of Evidence 401 and 403 because Izzat never alleged that Odom altered the documents or that Odom turned them over without Izzat's permission.

We review "a district court's evidentiary rulings for abuse of discretion." *United States v. Ortiz-Orellana*, 90 F.4th 689, 698–99 (4th Cir. 2024). Here, we apply "a highly deferential standard of review to . . . a trial court's decision to admit evidence over a Rule 403 objection," and that decision "will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (internal quotation marks omitted).

Izzat argues that the testimony of his former attorney regarding the documents submitted at the July 2020 Meeting was unduly prejudicial and unnecessary to the Government's case such that it should have been excluded. Izzat contends that he never intended to argue that the documents were not provided to the Government in the exact form that Izzat received them. Therefore, in Izzat's view, because he did not plan to argue that the documents were altered, Odom's testimony was not necessary to establish a chain of custody for the envelopes. Rather, Izzat argues that the fact that "he passed the Kyber documents [to the Government] in the same condition that [the Postal Inspector] received them was a necessary aspect to Izzat's defense that he was an innocent victim of Tarik's scam." Izzat's Opening Br. at 35–36.

In response, the Government argues that Odom's testimony was highly relevant because it established Izzat's responsibility "for providing the phony Kyber Capital

envelopes and Seven Digital banking information to the [G]overnment." United States Resp. at 42. This is particularly true, the Government notes, because Izzat refused to stipulate to the admissibility of the allegedly false documents.

It is well settled that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is relevant only if it has the "tendency to make a fact more or less probable than it would be without the evidence," and then only if that "fact is of consequence in determining the action." Fed. R. Evid. 401(a)–(b). Even where arguably relevant, "Rule 403 requires exclusion of evidence only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003) (internal quotation marks omitted); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

Here, Odom's testimony did not create any risk of unfair prejudice. "The mere fact that the evidence . . . damage[d] the defendant's case is not enough" to hold that the evidence was unfairly prejudicial such that its admission was an abuse of discretion. *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (en banc). Odom's testimony that Izzat provided him with the Kyber envelopes and other documents that Odom then provided to the Government without alteration was both relevant and highly probative to Izzat's false statement charge. This is because "no other witness c[ould] provide the information [in support of Count Three] that Izzat allegedly gave Odom the false documents which Odom provided to the Government." J.A. 2242. And although Izzat

argues that he did not "challeng[e] that he passed the Kyber documents in the same condition [he] received them" to Odom, *see* Izzat's Opening Br. at 35, Izzat nevertheless declined to stipulate to their admissibility when requested to do so by the Government.  It was thus necessary to authenticate their provenance.

Moreover, the district court took great care to ensure that Odom's testimony did not create any undue prejudice.  The court limited the testimony to only five questions which pertained specifically to the admissibility of the documents.  Further, the district court excused the jury during the cross examination of Odom in order to address any matters of attorney-client privilege without the jury present.  The district court also instructed the jury that Odom was appearing pursuant to a subpoena and not on his own volition so as to avoid any impression that Odom was supporting the prosecution's case against Izzat.

Where the testimony was highly probative and limited by the district court to only the relevant information, the district court did not abuse its discretion in admitting it.

## C.
### The Calculation of Izzat's Guidelines Sentencing Range

Izzat challenges the district court's application of the "loss" and "gross receipts" enhancements pursuant to Guidelines § 2B1.1.  He argues that these enhancements do not apply because he was acquitted of the associated conduct at trial.  Izzat further argues that, even if the district court properly relied on acquitted conduct, the court erred by failing to consider whether "loss" as written in section 2B1.1 is genuinely ambiguous before relying on the commentary to that section.  Izzat argues that because "loss" is not ambiguous and means only actual loss, the district court erred in relying on the commentary's definition

of "intended loss" to enhance his sentence.  "When considering a challenge to a district court's application of the Guidelines, this Court reviews factual findings for clear error and legal conclusions de novo."  *United States v. Shivers*, 56 F.4th 320, 324 (4th Cir. 2022).

1.
*Use of acquitted conduct at sentencing*

At his sentencing hearing, the district court relied on Izzat's knowledge of the fraudulent PPP loan scheme to enhance to his base offense level.  Specifically, the district court held that "the evidence presented at trial proved that [Izzat] participated in the conspiracy to commit wire fraud and [the] bank fraud [scheme], and that these offenses resulted in the funds laundered into a money laundering conspiracy, even if [Izzat] wasn't found guilty beyond a reasonable doubt for [either charge]."  J.A. 2258.  Concluding that Izzat's participation in the fraudulent scheme was supported by a preponderance of the evidence, the district court applied the total $1.75 million as the loss amount caused by Appellants to Izzat's Guidelines sentencing range calculation.  And because the loss amount known or reasonably foreseeable based on Appellants' conduct was "[m]ore than $1,500,000" but less than $3,500,000, Izzat received a 16 level increase to his base offense level.  *See* Guidelines § 2B1.1(b)(1)(I).

Izzat contends that the district court erred in relying on acquitted conduct to enhance his sentencing range.  Regarding the section 2B1.1 sentencing enhancements, Izzat argues that he did not cause any "loss" associated with the PPP loans because he was acquitted of the fraud charges.  Nor did he receive any "gross receipts" based on his convicted activity of conspiracy to commit money laundering.

37

Izzat's contention that his Guidelines base offense level can only consider the amount of money he laundered defies the plain text of the Guidelines. In order to calculate the base offense level for a money laundering offense, Guidelines § 2S1.1 points a sentencing court to the Guidelines base offense level "for the underlying offense from which the laundered funds were derived." Guidelines § 2S1.1(a)(1). Here, the underlying offense from which the PPP loans were derived was the fraudulent loan scheme. Fraud offenses rely on section 2B1.1 for their recommended Guidelines sentencing range. Section 2B1.1(b)(1) requires a sentencing court to apply certain enhancements to a defendant's offense level depending on the amount of "loss" related to the fraud committed. And section 2B1.1 also allows a sentencing court to apply a two level enhancement if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." *Id.* § 2B1.1(b)(17)(A).

Further, as it currently stands, "it is firmly established that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge[s], so long as that conduct has been proven by a preponderance of the evidence." *United States v. Hunt*, 99 F.4th 161, 191 (4th Cir. 2024) (internal quotation marks omitted) (alterations in original); *see* Guidelines § 1B1.3(a)(1)(A) (instructing sentencing court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"). Indeed, "[s]entencing judges may find facts relevant to deter[]mining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." *United States v.*

*Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009) (internal quotation marks omitted).  In other words, "a court's consideration of acquitted conduct does not violate the Sixth Amendment because as far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence in the absence of the special facts." *United States v. Medley*, 34 F.4th 326, 336 (4th Cir. 2022) (cleaned up).

While the Supreme Court has recently called this practice into question, *see McClinton v. United States*, 600 U.S. -- , 143 S. Ct. 2400, 2401 (2023) (noting that the practice of relying on acquitted conduct "raises important questions that go to the . . . perceived fairness of the criminal justice system."), the Court has not yet put an end to it. And as recently as 2022, we have confirmed that district courts have "broad discretion to impose sentences fully reflecting the defendant's background, character, and conduct" which includes "bad conduct," such as "related criminal activity." *United States v. Legins*, 34 F.4th 304, 326 (4th Cir. 2022) (internal quotation marks omitted).  Without contrary authority, the district court did not err when it considered acquitted conduct that was established by a preponderance of the evidence to apply the loss and gross receipts enhancements.[11]

---

[11] On April 17, 2024, the Sentencing Commission voted in favor of revising the Guidelines to limit the ability of a sentencing judge to consider conduct for which criminal defendants were acquitted at trial.  The amendment, which is slated to go into effect on November 1, 2024 unless Congress acts to disapprove it, would add to Guidelines § 1B1.3 a new subsection providing that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court unless such conduct also establishes, in whole or in part, the instant offense of conviction."  *See* Amendments to the Sentencing Guidelines 1 (Apr. 30, 2024).

2.

*Application of "intended loss" pursuant to § 2B1.1*

Next, we consider whether the district court properly calculated the loss amount applicable to Izzat's sentencing range. In calculating Izzat's base offense level, the district court relied on the commentary to section 2B1.1. That commentary directs the district court to calculate "loss" as the greater of actual or intended loss. Izzat argues that, even if the district court properly considered conduct for which he was acquitted, it nonetheless erred when it applied the intended loss amount to enhance Izzat's sentence. Izzat contends that "loss" should be interpreted strictly as actual loss. Therefore, he argues that the district court should not have included the full amount of the PPP loan funds in its calculations at sentencing. Izzat maintains that the true "actual loss" suffered by the Government was only $299,691. When determining whether to defer to the Guidelines' commentary, we apply the framework set forth in *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See United States v. Boler*, -- F.4th --, 2024 WL 3908554 (4th Cir. Aug. 23, 2024); *see also United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023). Pursuant to *Kisor*'s directive, we defer to agencies' interpretations of their own rules only in certain circumstances. This deference is commonly referred to as *Seminole Rock/Auer* deference.[12] "*Auer* deference 'can arise only if a regulation is genuinely ambiguous.'" *Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019) (quoting *Kisor*, 588 U.S. at 573).

---

[12] *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

We recently addressed this issue in *United States v. Boler*.  We held that "loss" as written in Guidelines § 2B1.1 is genuinely ambiguous.  2024 WL 3908554, at *5–7.  We further determined that the commentary's definitions of "[a]ctual loss" and "[i]ntended loss" were reasonable interpretations of section 2B1.1.  *Id.* at *7.  And finally, we concluded that the "character and context" of the commentary to Guidelines § 2B1.1 supported that it was deserving of deference.  *Id.* at *9.  Thus, the district court did not err in relying on the commentary to calculate Izzat's sentencing Guidelines sentencing range pursuant to Guidelines § 2B1.1.[13]

## D.
### The Calculation of Tarik's Guidelines Sentencing Range

On appeal, Tarik argues that the district court improperly calculated the amount of loss applicable to his sentencing pursuant to Guidelines § 2B1.1.  In doing so, Tarik first contends that only the amount of money laundered in connection with his substantive money-laundering conviction on Count Four ($149,000), as opposed to the amount of the entire PPP loan scheme ($1.75 million), should control his sentencing calculations.  Similar to Izzat, Tarik argues that the district court improperly calculated the loss amount by relying on the "intended loss" definition in the commentary to Guidelines § 2B1.1.  Tarik also argues that the district court improperly applied a two level enhancement for use of

---

[13] As we noted in *Boler*, the Sentencing Commission has recently promulgated amendments to the Guidelines that will resolve this issue going forward.  The amendments will incorporate the intended loss commentary, Guidelines § 2B1.1 cmt. 3(A), into the Guidelines' text.  89 Fed. Reg. 36,853, 36,855–36,857 (May 3, 2024) (effective Nov. 1, 2024, absent contrary action by Congress).  Thus, the text of the Guideline itself will define "loss" as the greater of the actual loss or intended loss.

sophisticated means because PPP loan fraud necessarily relies on sophisticated conduct. Finally, Tarik contends that the district court erred by refusing to consider relevant 18 U.S.C. § 3553(a) factors that he says warranted a downward variance[14] in his case.

1.

*Calculation of Tarik's "loss" amount pursuant to section 2B1.1*

Again, as discussed above, Guidelines § 2S1.1 points to section 2B1.1 as the section associated with "the underlying [fraud] from which the laundered funds were derived." *See* Guidelines § 2S1.1(a)(1). Section 2B1.1 directs the sentencing court to apply the higher of the intended loss or actual loss amount. Here, Appellants received $1.75 million in PPP loan funds to which they were not entitled. Whether the Government was able to collect $1.3 million from Appellants' BOA accounts is of no moment. Appellants would only receive a credit of that amount for sentencing purposes *if* they themselves had returned the illicitly obtained funds *before* the offense was detected. Indeed, the commentary to section 2B1.1 accounts for such credits where the money or property at issue is "returned . . . by the defendant or other persons acting jointly with the defendant, to the victim *before* the offense was detected." *Id.* § 2B1.1 cmt. 3(E)(i) (emphasis supplied).

---

[14] Although Tarik argues on appeal that a "downward departure[]" was warranted, we review his request as one for a downward variance. The terms "variance" and "departure" describe two distinct sentencing options available to a sentencing court. *See Irizarry v. United States*, 553 U.S. 708, 713–16 (2008). A departure is a sentence "imposed under the framework set out in the Guidelines." *Id.* at 714. Conversely, a variance has been recognized as a non-Guidelines sentence (either above or below the properly calculated advisory Guidelines range) that is nevertheless "justified under the sentencing factors set forth in 18 U.S.C. § 3553(a)." *Id.* at 715.

42

And Tarik fails to point to any precedent that would require a sentencing court to apply only the amount of money laundered as opposed to the full amount of the fraudulent PPP loan scheme to calculate "loss" in this circumstance. Indeed, doing so would contradict the Guidelines, which direct the sentencing court to apply the higher intended loss amount. *See* Guidelines § 2B1.1 cmt. 3(A).

Finally, as we previously held, "loss" as written in § 2B1.1 is genuinely ambiguous such that the district court properly relied on the commentary to calculate the appropriate amount of "loss" for sentencing. *Boler*, 2024 WL 3908554 at *9).

## 2.
### *Tarik's sophisticated means enhancement*

The district applied a two level sentencing enhancement to Tarik's sentence for the use of sophisticated means in carrying out the crime. The Guidelines provide for a two level enhancement when the offense involves "sophisticated means" when the scheme arose out of "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Guidelines § 2B1.1 cmt. 9(B); *see also id.* § 2B1.1(b)(10)(C) (requiring a two level increase if the defendant used "sophisticated means"). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, [and] corporate shells . . . ordinarily indicates sophisticated means." *Id.* cmt. 9(B). The sophisticated means enhancement "applies where the entirety of a scheme

constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014)

Whether a defendant's conduct involved sophisticated means is a factual inquiry that we review for clear error. *See Adepoju*, 756 F.3d at 256. When reviewing for clear error, the district court's determination need only be "plausible in light of the record viewed in its entirety." *United States v. Gross*, 90 F.4th 715, 722 (4th Cir. 2024) (internal quotation marks omitted).

Tarik argues that because money laundering in and of itself necessarily involves complex transactions, his conduct does not rise to the level required for a "sophisticated means" enhancement. In response, the Government points to several pieces of evidence in support of the enhancement. First, the Government notes that Tarik created Green Apple Catering in March 2020 which he used as a shell company to obtain $1 million in PPP loans. Next, the Government emphasizes that Tarik created a fictitious entity, Kyber, as well as the deceptive chat log to attempt to hide his scheme.

On these facts, we cannot say that the district court clearly erred in applying a sophisticated means enhancement where Tarik took several complex steps to execute and then cover up his criminal conduct. The evidence cited by the Government is more than sufficient to support a sophisticated means enhancement. Initially, Tarik created a shell company, Green Apple Catering, for which he submitted a fraudulent PPP loan application that relied on falsified payroll and tax documents. *See United States v. Bisong*, 645 F.3d 384, 400 (D.C. Cir. 2011) (concluding that the defendant's use of computer software to generate the fraudulent checks underlying the check fraud conviction warrant sophisticated

means enhancement).  Moreover, he orchestrated the existence of a third party, Kyber, on which he attempted to pin responsibility for the Loan Applications.  And in doing so, he created a false chat log with a purported Kyber representative to support his story.  *See United States v. Allan*, 513 F.3d 712, 714 (7th Cir. 2008) (holding that conduct in support of wire fraud conviction such as "fabricated identities, e-mail addresses, and telephone numbers, which [the defendant] listed on the forms so that any effort to verify the phony purchasers would be routed back to him" justified a sophisticated means enhancement).

### 3.
### *The § 3553(a) sentencing factors*

Finally, Tarik contends that the district court erred by refusing to consider relevant 18 U.S.C. § 3553(a) factors that he says warranted a downward variance in his case. "Section 3553(a) compels district courts to consider several factors in order to impose lawful sentences." *United States v. Montes-Pineda*, 445 F.3d 375, 378 (4th Cir. 2006).  "A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor." *United States v. Jenkins*, 22 F.4th 162, 170 (4th Cir. 2021); *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006) (explaining that to establish the reasonableness of a sentence, a district court need not "robotically tick through" every § 3553(a) factor on the record). "This is particularly the case when the district court imposes a sentence within the applicable Guidelines range." *Johnson*, 445 F.3d at 345.

At his sentencing, Tarik argued that various § 3553(a) factors warranted a downward variance.  First, Tarik argued that he did not personally profit from the fraudulent scheme and engaged in the scheme only to help his family "under the

extraordinary pressure of the pandemic." Tarik's Opening Br. at 49. Tarik further noted his lack of criminal history, his educational background, and his strong family support to argue that he poses a low risk of recidivism.

Tarik also argued that, were the district court to sentence him within the recommended Guidelines range, it would create a disparity in sentencing among similarly situated defendants. Tarik presented the district court with similar cases in which defendants received substantially lower sentences than Tarik's proposed Guidelines sentencing range.

For instance, Tarik highlighted the case of *United States v. Pan*, No. 5:20-cr-436 (E.D.N.C.) in which a North Carolina defendant "was sentenced . . . to 20 months in prison for fraudulently obtaining over $1.7 million in" PPP loans. J.A. 2116 (quoting Dept. of Defense, *North Carolina Man Sentenced for $1.7 Million COVID-19 Fraud* (Mar. 15, 2022), https://www.justice.gov/opa/pr/north-carolina-man-sentenced-17-million-covid-19-fraud [https://perma.cc/8JHK-CA6T]). And in the case of *United States v. Jaafar*, No. 1:20-cr-185 (E.D. Va.), the defendant was "sentenced to 12 months in prison and two years of supervised release" for conspiring "to create four shell companies" and applying "for 18 separate PPP loans totaling approximately $6.6 million," from which that defendant "received approximately $1.4 million." *Id.* (citing Dept. of Defense, *Man Sentenced for COVID-19 Fraud Involving Paycheck Protection Program* (Nov. 13, 2020), https://www.justice.gov/usao-edva/pr/man-sentenced-covid-19-fraud-involving-paycheck-protection-program [https://perma.cc/9S9Z-HZ6H]).

On appeal, Tarik argues that the district court erred when it refused to consider these § 3553(a) factors.  Contrary to Tarik's assertion, the district court did, in fact, consider his § 3553(a) arguments but found them unavailing.  The district court considered the § 3553(a) factors, including the seriousness of the offense, Tarik's lack of criminal history and record of "assisting good deeds," and the need for deterrence.  *See* J.A. 2435–41.  This was more than sufficient to discharge the district court's duty to consider the § 3553(a) factors.  And the district court found Tarik's argument concerning the need to avoid unwarranted sentence disparities among similar defendants unpersuasive, noting that the cases he cited were not comparable to his own.  *See* 18 U.S.C. § 3553(a)(6).  For instance, the district court pointed out that the cited cases involved only fraud counts and did not have "any discussion [of] money laundering."  J.A. 2405.  And, significantly, as the district court noted, those cases were resolved through plea negotiations rather than proceeding to trial, a factor that distinguishes them from Tarik's case.

Finally, as we have repeatedly held, "[a] sentence that falls within the advisory Guidelines range . . . is deemed presumptively reasonable."  *United States v. Everett*, 91 F.4th 698, 714 (4th Cir. 2024) (internal quotation marks omitted).  "[A] defendant can only rebut the presumption by demonstrating that the sentence is unreasonable when measured against the § 3553(a) factors."  *Montes-Pineda*, 445 F.3d at 379 (internal quotation marks omitted) (alterations in original).  Although at the high end of his sentencing range, Tarik was sentenced to 87 months imprisonment -- a term that falls within his recommended Guidelines sentencing range of 70 to 87 months.  Tarik has failed to demonstrate that his

sentence was unreasonable, and we conclude that the district court's discussion of the § 3553(a) factors sufficiently supports the sentence imposed.

III.

Finding no reversible error, the judgment of the district court is

*AFFIRMED.*

QUATTLEBAUM, Circuit Judge, concurring in part, and concurring in the judgment:

I join the majority opinion except for part II.C.2. As to that part, I also affirm the district court. But I do so for different reasons.

Izzat Freitekh challenges the district court's loss calculation under U.S.S.G. § 2B1.1. According to Izzat, the district court abused its discretion with respect to the loss amount by finding him responsible for $1.75 million in intended loss from fraud. Izzat points out that the jury acquitted him of fraud and convicted him of laundering $299,261. Thus, he argues $299,261 is the actual loss for his conduct. As a result, he maintains that finding him responsible for $1.75 million in intended loss from fraud was improper.

Following our decision in *United States v. Boler*, No. 23-4352, 2024 WL 3908554 (4th Cir. Aug. 23, 2024), the majority holds that the term "loss" in § 2B1.1 is ambiguous and therefore permits deference to that section's Guidelines commentary. That commentary provides that loss includes not just "actual loss" but "intended loss." So, the majority affirms the district court's reliance on that commentary to find Izzat responsible for $1.75 in losses.

As I explained in my dissenting opinion in *Boler*, I disagree that "loss" in § 2B1.1 is ambiguous. In my view, loss means actual loss, not intended loss. *See Boler*, 2024 WL 3908554 at *9. But *Boler* is now the law in our Circuit and thus binding on this panel.

Even so, I do not think *Boler* applies to Izzat's challenge to the district court's loss calculation under U.S.S.G. § 2B1.1. That's because his primary argument focuses on convicted versus acquitted conduct, not actual loss versus intended loss. And as the majority properly points out, Supreme Court and Fourth Circuit precedent forecloses that

49

argument. *See* Maj. Op. at 39. What's more, to the extent Izzat advances an actual loss versus intended loss position, the entire $1.75 million received in fraudulent PPP loans was an actual loss. True, after the fraudulent scheme was discovered, the bank froze certain accounts permitting the government to recoup some of its losses. But that does not mean the losses were not actual or that they did not occur. The entire amount of the proceeds represents actual losses.

So, although I would not rely on *Boler*, I still would affirm the district court's loss calculation under U.S.S.G. § 2B1.1.